HEALTHCARE RECOVERIES, INC.
As Agent for United Healthcare of Arkansas *v.*
ARKANSAS CLIENT SECURITY FUND,
Joann Maxey, Chair

05-78                                                    211 S.W.3d 512

Supreme Court of Arkansas
Opinion delivered June 30, 2005

[Rehearing denied September 8, 2005.]

*Bailey, Trimble, Lowe, Sellars & Thomas*, by: *Peter O. Thomas, Jr.*, for appellant.

*Michael E. Harmon*, for appellee.

Tom Glaze, Justice. In June of 1997, Megan Ungerer, a minor, was injured in a car accident caused by Joann Jennings. After the accident, United Healthcare of Arkansas ("United"), provided her with health insurance and paid her medical bills. Megan's mother, Charann Ungerer Cooley, was appointed guardian of Megan's estate, and Cooley retained attorney Dennis Cameron to represent the estate. On November 17, 1998, Cameron filed a petition seeking authority to settle Megan's claim, asserting that Jennings had offered $300,000.00 to settle the claim. That same day, the Garland County Probate Court entered an order approving the proposed compromise. The order noted that, pursuant to the settle-

ment agreement, the guardian was authorized to disburse funds as follows: $99,900.00 in attorney's fees; $2,100.00 in costs; and the balance, $198,000.00 to Megan, subject to payment of her medical bills. A handwritten notation on the order, initialed by the judge, stated: "Balance to be placed in locked account(s)[;] withdrawal only by court order."

On July 27, 2001, United's agent for collection, appellant Healthcare Resources, Inc. ("HRI") wrote to attorney Cameron about United's "outstanding subrogation and medical lien on the recovery obtained on behalf of Megan Ungerer." HRI informed Cameron that United was owed $41,781.07 out of the $300,000.00 recovery obtained. HRI contended that sum should be paid out of the $198,000.00 of the settlement proceeds that were ordered into a "locked account" by the probate court.

HRI did not receive a response to the July 27, 2001, letter from Cameron, and contacted him again on August 16, 2001, and August 29, 2001. Cameron sent a letter back to HRI on September 5, 2001, stating that he would be "happy to arrange a meeting" to discuss the money, but would have to wait to do so due to his wife's upcoming surgery. On October 23, 2001, HRI wrote back to Cameron, stating that it had attempted to call to set up an appointment, but Cameron's phone had been disconnected. On November 29, 2001, HRI again wrote to Cameron, stating that United had instructed HRI to initiate legal proceedings for the enforcement of the court's orders concerning payment of the medical liens.

When HRI received no response from Cameron, it filed a "petition for payment of medical bills subrogation" in the Garland County Probate Court. In its petition, HRI asserted that United had paid $41,781.07 for medical services rendered to Megan Ungerer, and asked the court to order that sum to be paid to HRI, as agent for United, out of the $198,000.00 that had been ordered placed in a locked account. Cameron filed a response on March 15, 2002, denying that HRI was entitled to any subrogation on the grounds that HRI did not enter into any agreement with Megan, Megan's mother, or counsel to protect its rights as to payment for medical expenses." Further, Cameron alleged that Megan had not been "made whole" by the settlement, and HRI was therefore not entitled to subrogation.

On July 1, 2002, the probate court entered an order directing Cameron to file an accounting with the court within thirty days, detailing the location of Megan's funds, along with all

payments and disbursements from the account in which the money had been placed. Cameron filed a response in which he asserted that the funds were located at Malvern National Bank in Hot Springs. Cameron further claimed that there had been no payments or disbursements from the account since its inception.

Some time after Cameron's response, it was discovered that the funds that had allegedly been deposited with Malvern National Bank had, in fact, never been deposited. On October 28, 2002, the Garland County Prosecuting Attorney charged Cameron with two counts of theft of property. In November of 2002, the Supreme Court Committee on Professional Conduct placed Cameron on interim suspension. In 2005, Cameron was convicted of theft, and on March 11, 2005, Cameron filed a petition to surrender his law license.

On June 23, 2004, HRI filed an application for relief with the Arkansas Client Security Fund, alleging that HRI, as agent for United, had sustained a loss as a result of Cameron's dishonest conduct. On October 11, 2004, the Client Security Fund denied HRI's claim. HRI filed a timely notice of appeal, and now argues to this court that the Client Security Fund abused its discretion in denying HRI's claim for relief.

The Client Security Fund was created for the purpose of protecting clients from losses caused by the dishonest conduct of members of the Arkansas bar. *See In re: Client Security Fund*, 254 Ark. 1975, 493 S.W.2d 422 (1973) (*per curiam*). Under the Rules of the Client Security Fund Committee, a claim may be made with the Committee under the following circumstances:

> A. The loss must be caused by the dishonest conduct of the lawyer and shall have arisen out of and by reason of a lawyer-client relationship or a fiduciary relationship between the lawyer and the claimant.
>
> B. The claim shall have been filed no later than three years after the claimant knew or should have known of the dishonest conduct of the lawyer.
>
> C. As used herein, "dishonest conduct" means wrongful acts committed by a lawyer in the nature of theft or embezzlement of money or the wrongful taking or conversion of money, property, or other things of value. A dispute over the reasonableness of a lawyer's fee is not an eligible claim.

Client Sec. Fund Comm. R. 4.

The Rules further provide the following:

> The Committee is authorized and empowered to admit or reject such claims in whole or in part to the extent that funds are available to it, and the Committee shall have complete discretion in determining the order and manner of payment of claims. No claim shall be allowed for an amount in excess of $40,000. All reimbursements shall be a matter of grace and not of right, and no client or member of the public shall have any right in the Client Security Fund as third-party beneficiary or otherwise. No attorney shall be compensated for prosecuting a claim against the Fund.

Rule 4(F).

■■ This court has held that there is a right of appeal from a decision of the Client Security Fund Committee, although the Rules do not expressly provide for such a right. *See Nosal v. Neal*, 318 Ark. 727, 888 S.W.2d 634 (1994) (citing *Sexton v. Supreme Court Comm. on Professional Conduct*, 297 Ark. 154-A, 761 S.W.2d 602 (1988)). This court has further noted that, although reimbursement from the Fund is a matter of grace and not a matter of right, a client should be reimbursed when his or her claim validly comes within the provisions of the rules for reimbursement and the Client Security Fund Committee has sufficient funds to make the payment. *Nosal*, 318 Ark. at 731.

On appeal, HRI asserts that its claim came within the Rule's provisions because the probate court's order directing the money to be deposited into a locked account placed Cameron in a fiduciary relationship with HRI. HRI argues that the Fund thus abused its discretion in denying its claim because Cameron had, in effect, been "appointed trustee over the $198,000.00 in settlement proceeds," and Cameron held the money in trust for the payment of Megan's medical bills. HRI acknowledges that the probate court never used the words "trust" or "trustee," but contends that the directions to place the money into a locked account "clearly created an implied trust, either a constructive trust or a resulting trust, by operation of law." Thus, because HRI and Cameron had a fiduciary relationship, HRI claims it was entitled to compensation for its loss.

■ We are unable to reach the merits of HRI's arguments, however, because HRI has raised these claims for the first time on appeal. In neither its petition for payment of medical bills nor in its

application for relief filed with the Fund did HRI assert that a trust had been created by reason of the order directing the money to be deposited into a locked account. Although there are very few cases dealing with appeals from the actions of the Client Security Fund, and none that deal with the question of preserving issues for appeal, it is axiomatic that in any case, in order to preserve an argument for appeal, the argument must be made during the earlier stages of the proceedings. *See, e.g., Wilson v. Neal,* 332 Ark. 148, 964 S.W.2d 199 (1998) (declining to address issue for first time on appeal following disbarment proceedings); *Dodrill v. Executive Director, Committee on Professional Conduct,* 308 Ark. 301, 824 S.W.2d 383 (1992) (same); *see also Nosal v. Neal, supra* (analogizing appeals from Client Security Fund Committee decision to appeals from decisions by the Committee on Professional Conduct).

■ Scrutiny of HRI's petition for payment filed with the probate court reveals that HRI never raised the argument that the settlement funds were placed in trust by operation of the probate court's order, nor did HRI mention its fiduciary relationship theory in its application to the Client Security Fund Committee so that the Committee could consider the basis for HRI's request for reimbursement. Having failed to raise the argument anywhere below, HRI's sole argument on appeal is not preserved.