Gregory T. ERKINS, Appellant,

v.

ALASKA TRUSTEE, LLC, Bank of New York Trust Company, N.A., and JP Morgan Chase Bank, N.A., Appellees.

No. S–13680.

Supreme Court of Alaska.

Oct. 21, 2011.

Gregory T. Erkins, Anchorage, pro se, Appellant.

Richard N. Ullstrom, Routh Crabtree Olsen, PS, Anchorage, for Appellees.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

STOWERS, Justice.

## I. INTRODUCTION

In 2004 and 2005, while allegedly bedridden and taking prescription pain medication, Gregory Erkins took out two successive loans on his house. The proceeds of the second, larger loan were used in part to pay off the first. Erkins made payments on the second loan on schedule for approximately two years. In early 2007, Erkins ceased making regular payments and this loan fell into default. His house was listed for foreclosure sale. Also, at some point between February 2005 and November 2007, the loan was assigned from Ameriquest Mortgage Company (Ameriquest), the loan originator, to appellee Bank of New York Trust Company, N.A. (Bank of New York).

Acting pro se, Erkins filed suit in the superior court on July 17, 2008 against Alaska Trustee, LLC, Bank of New York (the current holder of the loan), and JP Morgan Chase Bank, N.A. (JP Morgan) (a party apparently unconnected to the proceedings except in that Bank of New York was listed as its successor). Erkins disputed the terms of the second loan, and argued fraud as well as lack of contractual capacity at the time of its origination.

Several months after Erkins filed his complaint, as a trial date was about to be set, counsel for the defendants presented Erkins with a forbearance agreement from Wilshire Credit Corporation, the servicer of the loan and not a party to the lawsuit. This agreement contemplated postponing the foreclosure sale in exchange for $2,000 monthly payments. Erkins executed this agreement. Allegedly unbeknownst to Erkins, the agreement also contained a waiver of claims broad enough to cover Erkins's claims against the defendants. Nine months later, the defendants moved for summary judgment, arguing that this waiver of claims functioned as a settlement and released all of Erkins's claims in this suit. The superior court granted summary judgment to the defendants, finding no genuine issue of material fact barring judgment that they were not liable for any tort of Ameriquest, and that Erkins had released his claims in the forbearance agreement. This appeal followed.

We AFFIRM that portion of the superior court's decision finding that defendants could not be held liable for the alleged torts of Ameriquest, the originating lender. But we REVERSE that portion of the superior court's order concluding that Erkins released his claims against the defendants by entering into a forbearance agreement because a genuine issue of material fact exists as to whether the inclusion of the waiver of claims provision in the forbearance agreement constituted constructive fraud.

## II. FACTS AND PROCEEDINGS

Gregory T. Erkins has been a licensed real estate broker and agent in Alaska since 1984. In 2000, Erkins was injured in an automobile accident and began taking Actiq, a narcotic analgesic.

In October 2004, Erkins acquired title to a house in Anchorage. Through Ameriquest, Erkins also obtained an $80,000 loan secured by the property. This loan carried a 7% interest rate for a 30–year term, and monthly payments of $531. After fees and closing costs and the payment of certain debts, Erkins received $59,615.80 in cash. The $80,000 deed of trust was recorded on October 29, 2004.

Erkins negotiated the terms of this loan and signed the paperwork from his home; he was "unable to drive because of pain medication."

Approximately four months later, on February 19, 2005, Erkins obtained a second loan

on the property, also from Ameriquest, this time in the amount of $142,477. An agent again visited Erkins at home due to his "medical condition." Erkins claims he was told that "the payment would remain the same as the first loan," approximately $500 per month.

The second loan in fact carried an adjustable interest rate with an initial monthly payment of $962.30, a 7.15% initial interest rate, and the same term of 30 years.[1] The proceeds of this loan were used to cover its closing costs ($4,967.68) and to pay off the first loan ($80,075.51); the balance was paid in cash to Erkins ($57,433.81). The deed of trust for the second loan was recorded on March 4, 2005.

Erkins made payments on the second loan in full and on time from the first scheduled payment in April 2005 through August 2005, when servicing of the loan was transferred from Ameriquest to Wilshire Credit Corporation. Erkins also made several $500 prepayments of principal during this initial period. Erkins continued to make regular payments through January 2007, at which point payments became more sporadic and ultimately ceased entirely in August 2007.[2]

Ameriquest at some point assigned the second loan and deed of trust to the Bank of New York as successor to JP Morgan. It appears that this assignment may have occurred as early as February 28, 2005—within ten days of the origination of the loan and before the first monthly payment was due.[3]

After the second loan fell into delinquency, foreclosure proceedings were initiated and a foreclosure sale of the property was set for September 10, 2008.

On July 17, 2008, Erkins filed suit pro se against Alaska Trustee, LLC, Bank of New York, and JP Morgan in the superior court, alleging twelve causes of action chiefly related to fraud and misrepresentation.

The September 2008 foreclosure sale was postponed.[4] On October 20, 2008, Erkins emailed defendants' counsel to propose a settlement, which was ultimately rejected.[5] On October 31 defendants' counsel presented Erkins with a proposed forbearance agreement. The agreement stated that it was "between Borrower(s) and Wilshire as servicer for the owner of the Loan," and provided that Wilshire would stay pending foreclosure proceedings from December 1, 2008, until April 1, 2009, if Erkins: (1) executed and returned the agreement; (2) paid $2,000 by cashier's check by December 1, and $2,000 per month thereafter through April 1; and (3) kept the property insured and continued to pay property taxes.

In the four-page forbearance agreement, a paragraph titled "RELEASE OF CLAIMS" provided that the borrower

> jointly and severally, knowingly and voluntarily releases, discharges, and covenants not to sue, Wilshire, any owner of the Loan, and any of their predecessors, successors and assigns ... from any and all claims, demands, liabilities, defenses, setoffs, counterclaims, actions, and causes of

---

1. The record does not specify the term of this loan, but a loan repayment calculation reveals the term to be 30 years.

2. Erkins's January 2007 payment was reversed on January 12, and thereafter no payments posted for approximately three months. On April 16, 2007, a single payment in the amount of $4,017.54 posted to the account. Thereafter, payments resumed on a monthly basis until August 2007, when another payment was reversed and the record ends. Erkins filed suit nearly a year later, on July 17, 2008.

3. The parties are unclear as to precisely when this assignment occurred. Appellees contend that the assignment occurred "at a time when payments on the loan were current." The "Assignment of Deed of Trust" from Ameriquest to Bank of New York as successor to JP Morgan is dated February 28, 2005, only ten days after the loan was originated. But Ameriquest continued to service the loan through August 2005. The assignment was not recorded until November 29, 2007, nearly three years later.

4. The record omits explicit mention of these postponements, but the foreclosure sale is listed throughout the record as upcoming on a series of future dates.

5. Defendants' counsel delayed considerably passing on Erkins's settlement offer to his clients. Erkins's October 20, 2008 offer was not presented to defendants until January 21, 2009, and Erkins was informed of their rejection of it by a letter dated February 2, 2009.

action of whatsoever kind or nature, whether known or unknown, whether legal or equitable, which he or she has, or may assert as of and through the date of this Agreement against any of the Released Parties directly or indirectly, or in any manner connected with any event, circumstance, action or failure to act, of any sort or type, which was related or connected in any manner, directly or indirectly, to the Loan or any collateral securing the Loan.

Erkins signed the forbearance agreement and returned it with a cashier's check for $2,000 on November 14, 2008.

Four days after Erkins returned the forbearance agreement, on November 18, 2008, the court issued an initial pretrial order. A five-day trial was set for November 16, 2009. On December 8, 2008, defendants' counsel wrote to Erkins pointing out that Erkins had waived his claims through the forbearance agreement; on December 31, Erkins replied, denying the effect of the release provision and emphasizing his intent to proceed to trial.

On May 19, 2009, Erkins moved to stay the foreclosure sale (then scheduled for June 15, 2009) until after the November 16 trial. He argued that he signed the forbearance agreement chiefly "to provide time to negotiate a settlement," and when this did not occur, he "was forced to file [for] bankruptcy."

On June 23, 2009, the superior court denied Erkins's motion to stay the foreclosure sale. The court stated that Erkins had not shown that he would suffer irreparable harm if the property were sold, and that Erkins "fail[ed] to demonstrate a legal basis for imposing vicarious liability on the banks, one of which apparently purchased the notes," and thus failed to show a probability of success on the merits.

Defendants moved for summary judgment on August 24, 2009, arguing that Erkins had .waived his claims through the forbearance agreement,[6] that his claims were barred by the statute of limitations, that Erkins effectively ratified the second contract by making payments on the loan for two years, that he received the benefit of both loans, that he did not act within a reasonable time to correct any alleged mistake, and that he was not entitled to rescission of the contract.

In opposition, Erkins argued that the forbearance agreement was not a settlement, and in any case was between Erkins and Wilshire only. He did not respond to the majority of the defendants' grounds for summary judgment.

The superior court granted the defendants' motion for summary judgment on September 15, 2009, finding no genuine issue of material fact "that defendants [were] not liable for any tort of Ameriquest," and that Erkins "released his claims in [paragraph] 10 of the forbearance agreement."

Erkins filed a motion for reconsideration, which was denied. The court issued its final judgment on February 17, 2010. Erkins appeals.

## III. DISCUSSION

### A. Standard Of Review

■■■ We review a "grant of a summary judgment motion de novo, affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law. All reasonable inferences are drawn in favor of the nonmovant in this examination."[7]

■■■ "We will set aside a superior court's factual determination only upon a finding of clear error."[8] A factual determi-

---

6. At oral argument on appeal, appellees explicitly characterized the forbearance agreement with Erkins as a "settlement agreement," and confirmed that "from the appellees' point of view," the purpose of the forbearance agreement in this case was "to resolve the entire litigation." Appellees conceded, however, that nothing in the record directly supported its characterization as a settlement as opposed to a forbearance agreement, and that it was "simply presented to Erkins ... as a forbearance agreement."

7. *Beegan v. State, Dep't. of Transp. & Pub. Facilities*, 195 P.3d 134, 138 (Alaska 2008) (citing *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 152 P.3d 460, 465 (Alaska 2007)).

8. *Commercial Recycling Ctr., Ltd. v. Hobbs Indus., Inc.*, 228 P.3d 93, 98 (Alaska 2010) (citing *Moffitt v. Moffitt*, 813 P.2d 674, 676 (Alaska 1991)).

nation "is clearly erroneous if it is unsupported by the record, or we are left with 'a definite and firm conviction ... that a mistake has been made.' " [9]

■ The interpretation of an agreement between two parties is a question of law to which we apply our independent judgment.[10]

■ Additionally, we "apply a more lenient standard" to Erkins because he is a pro se litigant (as he has been throughout this proceeding).[11]

### B. The Superior Court Did Not Err In Ruling That There Was No Genuine Issue Of Material Fact Barring Judgment That Defendants Could Not Be Held Liable For The Torts Of Ameriquest, The Originating Lender.

■ Erkins's complaint alleged various torts associated with the origination of the two Ameriquest loans, yet named only Alaska Trustee, Bank of New York, and JP Morgan as defendants. Because no defendant was directly involved in those original loan negotiations—which were carried out by an entity called Mortgage Information Services on behalf of Ameriquest—liability, if any, would need to attach vicariously. The appellees contend that "Erkins never provided any evidence to link Appellees to [these] actions," and that there is "no basis upon which liability could be imputed to Appellees."

Bank of New York purchased Erkins's note from Ameriquest. It is not evident from the record that either Ameriquest or Mortgage Information Services was ever an agent, employee, or independent contractor of any appellee, nor is it apparent how any other theory of vicarious liability would link their behavior to any party to this lawsuit. Given these undisputed facts, liability cannot attach to the defendants for the earlier, allegedly tortious actions of Ameriquest or Mortgage Information Services during the origination process of the loans. Thus, the superior court did not err by ruling that there was no genuine issue of material fact that the defendants could not be held vicariously liable for any torts of the loan originators. As such, many of Erkins's claims against the defendants—those that sound in tort and concern the origination of the loan—were correctly dismissed.[12] We therefore affirm this portion of the superior court's grant of summary judgment.

### C. It Was Error To Grant Complete Summary Judgment Because A Genuine Issue Of Material Fact Exists As To Whether Including A "Settlement" Provision In The Forbearance Agreement In This Case Constituted Constructive Fraud.

■ In their motion for summary judgment, defendants argued that Erkins waived his claims through the forbearance agreement. In opposition, Erkins argued that the forbearance agreement was not a settlement. In their reply, defendants argued that the forbearance agreement was a "settlement" of Erkins's claims. At oral argument on appeal, defendants maintained that the forbearance agreement was a "settlement agreement" the stated purpose of which "was to resolve the entire litigation."

Erkins' argument is that the defendants "with inten[t] to defraud gave Mr. Erkins a forbearance agreement which he later found out to be in the guise of a settlement agreement," [13] but that the defendants "never stated [this] until a request for summary judgment was filed." (emphasis added). Erkins also alleged fraud in his opposition to defen-

9. *Id.* (quoting *Money v. Money,* 852 P.2d 1158, 1161 (Alaska 1993)).

10. *Hixson v. Sarkesian,* 66 P.3d 753, 757 (Alaska 2003) (citing *Flannery v. Flannery,* 950 P.2d 126, 129 (Alaska 1998)).

11. *See, e.g., Pieper v. Musarra,* 956 P.2d 444, 446 (Alaska 1998) (citing *Smith v. Sampson,* 816 P.2d 902, 906 (Alaska 1991); *Breck v. Ulmer,* 745 P.2d 66, 75 (Alaska 1987)).

12. These include Erkins's allegations of fraud, fraud in the inducement, and "scheme or [a]rtifice to [d]efraud," all of which implicate either Ameriquest or Mortgage Information Services as the primary tortfeasor.

13. Erkins presumably means a settlement agreement in the guise of a forbearance agreement.

dants' motion for summary judgment, and also in his December 31, 2008 letter to the appellees.[14]

In light of Erkins's pro se status,[15] we construe these arguments to allege constructive fraud. Constructive fraud is "a breach of a duty, which while not intentionally deceptive or actually dishonest, 'the law declares fraudulent because of its tendency to deceive others.' "[16] It "exists in cases in which conduct, although not actually fraudulent, ought to be so treated[ ]—that is, in which such conduct is a constructive ... fraud, having all the actual consequences and all the legal effects of actual fraud."[17]

Although there is generally "little probative value to be found in self-serving testimony by parties concerning their subjective intent upon entering into a contract,"[18] we have declined to enforce terms surreptitiously added to agreements. In *Pierce v. Pierce*, a divorce case, the husband's attorney added a new clause to the draft agreement following completed settlement negotiations.[19] This agreement was then signed without attention to the new term.[20] When the wife challenged the resulting order, the trial court issued an amended order deleting the con-

tested term, and we affirmed.[21] In *Adams v. Adams*, one party inserted a purchase option into a paragraph titled "Right of First Refusal" in a commercial lease without explicitly notifying the other party.[22] The lessee "chang[ed] a material condition of the lease without [the lessor's] consent or knowledge"[23] when he miscaptioned the relevant paragraph and failed to flag changes that had been made to the lease.[24] We found constructive fraud "because of the strong deceptive tendency of such conduct."[25]

Appellees asserted at oral argument that Erkins had "plenty of time" to read the agreement before he returned it. But if the agreement is found to have been misleading, this argument is unpersuasive. In *Adams*, we found the same assumption—namely, that the lessor would read the final version of the lease before signing it—to be insufficient to avoid a finding of constructive fraud:

it is not a sufficient excuse for one party to say that it believed that the other party would review a final document and notice an unannounced change. Making unannounced changes, as *Pierce* teaches, is inherently deceptive and wrongful.[26]

---

**14.** In this letter, Erkins stated "I totally disagree with your assertion that I '... waived all claims against the owners....' In fact I view it as *further evidence of the unfair dealing and bad faith* that permeates this loan.... I did not offer to dismiss the case, I only offered to pay $2,000 a month during this time and your clients agreed to forbearance until April 2009." (emphasis added).

**15.** Even absent this deference, this court can consider issues not explicitly raised in the trial court "if the issue is '1) not dependent on any new or controverted facts; 2) closely related to the appellant's trial court arguments; and 3) could have been gleaned from the pleadings,' or if failure to address the issue would propagate 'plain error.' " *Sea Lion Corp. v. Air Logistics of Alaska, Inc.*, 787 P.2d 109, 115 (Alaska 1990) (quoting *State v. Nw. Const., Inc.*, 741 P.2d 235, 239 (Alaska 1987)). The constructive fraud issue meets this tripart standard.

**16.** *Adams v. Adams*, 89 P.3d 743, 750 (Alaska 2004) (quoting *Knight v. Day*, 343 Ark. 402, 36 S.W.3d 300, 303 (2001)).

**17.** *Id.* at 750 (quoting *In re Arbuckle's Estate*, 98 Cal.App.2d 562, 220 P.2d 950, 954–55 (1950)) (internal quotation marks omitted).

**18.** *Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1170 n. 12 (Alaska 1998) (citing *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981); *Day v. A & G Const. Co.*, 528 P.2d 440, 444 (Alaska 1974)).

**19.** 949 P.2d 498, 499 (Alaska 1997).

**20.** *Id.*

**21.** *Id.* at 501.

**22.** 89 P.3d 743, 746, 749 (Alaska 2004).

**23.** *Id.* at 747.

**24.** *Id.* at 750.

**25.** *Id.* at 744.

**26.** *Id.* at 750. We note that even if there was misrepresentation, because Erkins "had a reasonable opportunity to read the [provision] before he signed it, his apparent assent ... was effective, and the [agreement] was voidable rather than void." *Id.* at 751. For Erkins to lose his power to avoid a voidable agreement, "a finding of actual knowledge of the misrepresentation,

Viewing the evidence in the light most favorable to Erkins, the non-moving party, we observe that the forbearance agreement between Erkins and a non-party [27]—the chief stated purpose of which was to postpone foreclosure of Erkins's home in exchange for interim monthly payments of $2,000—contained broad waiver and release language that was not highlighted as a central feature of the agreement. The release of claims, ultimately the agreement's most powerful feature, was omitted entirely from the section titled "AGREEMENT," which spans numbered paragraphs one through nine and sets forth the apparent material terms of the bargain. Neither the release of claims nor its dramatic effect on the ongoing litigation was mentioned in paragraphs one through nine of the agreement (or in its cover letter, which was prepared by the attorney representing the defendants). Moreover, Erkins argues, the agreement does not contain any of the terms one might expect a settlement to contain: it does not name the lawsuit or the parties involved, does not address attorney's fees, and does not discuss dismissal of any individual claims. Yet on appeal, appellees nonetheless explicitly characterized this as a "settlement agreement" whose stated purpose "was to resolve the entire litigation."

*Adams* suggests that material contract provisions should be fairly and candidly described.[28] As in *Adams*, it can be argued that there is no indication—not even a suggestion—in either the cover letter or the forbearance agreement that the agreement would be used to effect a "settlement" of all of Erkins's claims against Alaska Trustee, Bank of New York, and JP Morgan. The cover letter provides in full:

> Enclosed are two copies of a proposed forbearance agreement between yourself and Wilshire as servicer for Bank of New York Trust Company. Please review it and if the terms are satisfactory, sign and return both copies to Wilshire, along with your initial payment of $2000. Please note that the deadline for receipt of the signed agreements and downpayment by Wilshire is December 1. If you choose to send the agreements and payment via my office, they must be returned to me enough in advance of that date to assure their receipt by Wilshire before December 1.

The forbearance agreement states that it is between Erkins as borrower and Wilshire as servicer of the loan. Nowhere in the forbearance agreement are Bank of New York or JP Morgan named or referenced. Nowhere in the agreement is the superior court case named or referenced. Nowhere does the agreement expressly mention Erkins's claims against Alaska Trustee, Bank of New York, or JP Morgan. And the word "settlement" does not appear in the agreement. Viewing the evidence and reasonable inferences to be drawn from it in the light most favorable to Erkins, the apparent purpose of the forbearance agreement is to allow Erkins to pay Wilshire so that "Wilshire will refrain from initiating foreclosure proceedings" on the loan.

Notwithstanding all of the above, defendants argued to the superior court and on appeal to this court that the forbearance agreement was a settlement agreement and a settlement of Erkins's claims.

Unlike in *Adams*, the title of the actual paragraph purporting to waive Erkins's claims—"Release of Claims"—was not misleading. But the document was titled and referred to as a forbearance agreement, both within the document itself and in the cover letter that accompanied it, and the omission of any mention of a settlement clause from the introductory paragraphs, cover letter, or summary of salient points in the agreement itself renders this situation comparable to *Adams*.

Appellees conceded at oral argument that nothing in the record supports the characterization of this agreement as a settlement

---

rather than reason to know of it, is necessary." *Id.*

**27.** The agreement is between Erkins and Wilshire Credit Corporation. Although the cover letter specified that Wilshire was "servicer for Bank of New York Trust Company," the defen-

dants were not parties to the agreement and are not expressly named in the release, and Wilshire is not a party to this proceeding.

**28.** 89 P.3d 743.

agreement as opposed to a forbearance agreement, and that the document was "simply presented to Mr. Erkins ... as a forbearance agreement." Erkins also did not ratify this provision of the agreement: when told by the appellees that he had allegedly waived his claims, Erkins promptly denied the effect of the release provision [29] and emphasized his intent to proceed to trial.

In sum, appellees ask that we affirm summary judgment in this case based on the forbearance agreement presented to Erkins, a pro se litigant—an agreement that bears none of the hallmarks of a settlement agreement, and that Erkins claims he did not understand or intend to act as such. The inclusion of a broad waiver of claims effectively transformed this agreement from a simple forbearance agreement into a settlement *sub silentio* of Erkins's lawsuit. Under *Adams,* the appellees "had the obligation to bring the ... change to [Erkins's] attention" [30] if they intended the waiver to act as a settlement agreement.

There is a genuine issue of material fact whether constructive fraud exists with respect to the inclusion of purported "settlement language" in the forbearance agreement. Though the parties did not explicitly advance this issue, Erkins's pro se opposition to defendants' motion for summary judgment stated: "What the defendants are trying to do is the same thing their predecessors did: misrepresent. The agreement was a Forbearance Agreement not a Settlement Agreement. They cannot guise one into another." When granting summary judgment, the trial court has a duty to consider the full record and the "entire setting of the case" to ensure no triable issues of material fact exist, and in so doing must look beyond issues presented in the parties' motions.[31] Given the circumstances surrounding the forbearance agreement, Erkins's pro se status, and the arguments advanced by the parties, we conclude that Erkins asserted a claim of constructive fraud regarding the forbearance agreement. We also conclude that there is a genuine issue of material fact regarding the parties' intent as to the purpose and effect of the release of claims.

■■■■ We hold that this genuine issue of material fact precludes the award of complete summary judgment in this case, and we therefore reverse the superior court's decision. On remand, the superior court should examine the forbearance agreement in light of a theory of constructive fraud, as well as in light of the doctrine of unconscionability.[32]

---

**29.** Erkins asserts that he was never told the agreement was a "global settlement" and would have rejected such a thing had he known because he was "working with the court to schedule trial" when he signed it.

**30.** *Adams,* 89 P.3d at 750 (quoting *Pierce v. Pierce,* 949 P.2d 498, 500 (Alaska 1997)).

**31.** *See Prentzel v. State, Dep't. of Pub. Safety,* 169 P.3d 573, 582 (Alaska 2007) (quoting *Jennings v. State,* 566 P.2d 1304, 1310 (Alaska 1977)) (internal quotation marks omitted).

**32.** Other genuine issues of material fact may preclude summary judgment. Erkins argues contractual incapacity with respect to the two loans, claiming that he was bedridden and under the influence of potent pain medication at both signings. The entities that originated the loans—Ameriquest and Mortgage Information Services—are not parties to this proceeding. But even without resorting to vicarious liability, Erkins can assert an incapacity defense against enforcement of the note. The superior court on remand will need to consider whether there is merit to Erkins's incapacity defense.

Erkins also asserts that the note was past due at the time of its assignment to Bank of New York, and therefore that the bank is not a holder in due course. Under the Uniform Commercial Code doctrine of holder in due course, the bona fide purchaser of a note is shielded from most liability by taking the instrument free of all claims and personal defenses. *See* U.C.C. § 3–302 (2002) (codified in Alaska at AS 45.03.302) and U.C.C. § 3–305 (2002) (codified in Alaska at AS 45.03.305). A holder in due course is insulated from disputes arising between the original parties to the note, except some that concern fraud, capacity, infancy, or duress. *See* AS 45.03.305(b) (providing that although a holder in due course is insulated from many defenses, its right to "enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in [AS 45.03.305(a)(1)]," which lists infancy, lack of capacity, duress, fraud, illegality, and discharge in insolvency). AS 45.03.302(a)(2)(F) provides that one cannot be a holder in due course if one takes with "notice that any party has a defense or claim in recoupment described in AS 45.03.305(a)," a section that lists "lack of legal capacity" and "fraud." An owner also is a holder in due course only if he takes "without notice that the instrument is over-

## D. Summary Judgment Is Not Affirmed On Other Grounds.

██ The appellees suggest several other grounds on which to affirm the grant of summary judgment, among these that Erkins's claims are barred by Alaska statutes of limitations, citing AS 09.10.070 and .053. Alaska Statute 09.10.070 provides that actions for torts must generally be brought within two years, while AS 09.10.053 provides for a three-year statute of limitations for contract claims. Appellees contend that because Erkins executed the two Ameriquest loan agreements in October 2004 and February 2005 yet did not file his complaint until July 2008, all of his claims are barred. For this to be correct, the statute of limitations would have had to begin running at the time Erkins executed the second loan, or shortly thereafter.

██ Determining when a cause of action accrues "ordinarily presents a question of fact that must be resolved at an evidentiary hearing,"[33] and "[r]esolution of the issue on summary judgment is appropriate only if the superior court has before it uncontroverted facts regarding when the statute of limitations began running."[34] Under the discovery rule, "a cause of action accrues when a reasonable person has enough information to alert that person that he or she has a potential cause of action or should begin an inquiry to protect his or her rights."[35] Erkins's alleged incapacity at the time of origination of both loans may influence the time when the statute of limitations began to run. The superior court did not make a finding on this issue.

On the record before us, there are not uncontroverted facts supporting a conclusion that the statutes of limitations bar Erkins's claims, and affirming summary judgment on these independent grounds is inappropriate.

██ Appellees also contend that Erkins's claims are barred by ratification because Erkins did not disaffirm the loans for a period of roughly two years after their execution, during which time he received the benefit of the loans in the form of lump sum payouts, and also made regular payments. But, as with the statute of limitations issue, if Erkins suffered incapacity from the effects of medication during the origination period and thereafter, his subsequent actions may not constitute ratification until such time as he no longer was incapacitated.[36] Again, because the superior court made no findings on Erkins's incapacity claims, on the record before us we are unable to conclude that there is no genuine issue of material fact that Erkins ratified the loans.

## IV. CONCLUSION

We AFFIRM that portion of the superior court's decision finding that there was no genuine issue of material fact barring judgment that appellees could not be held liable for the alleged torts of the originating lender.

---

due or has been dishonored." AS 45.03.302(a)(2)(C). Thus, to qualify as a holder in due course, appellee Bank of New York must have taken Erkins's note without knowledge of his incapacity or fraud defenses, and before the note was overdue or in default.

The superior court did not address these issues. The record is unclear as to precisely when the assignment took place, and whether the loan was current at the time of assignment. *See supra* note 3. The loan was apparently in default by August 2007 at the latest, and the assignment was not recorded until November 29, 2007—although appellees state that the loan may have been transferred well before that time.

**33.** *See Egner v. Talbot's, Inc.*, 214 P.3d 272, 278 (Alaska 2009) (citing *Domke v. Alyeska Pipeline Serv. Co.*, 137 P.3d 295, 303 n. 19 (Alaska 2006); *Williams v. Williams*, 129 P.3d 428, 431 (Alaska 2006); *Palmer v. Borg–Warner Corp.*, 818 P.2d 632, 634 (Alaska 1990)).

**34.** *Id.* (citing *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1033 (Alaska 2002)).

**35.** *Id.* (citation omitted, internal quotation marks omitted); *see also Roach v. Caudle*, 954 P.2d 1039, 1041 (Alaska 1998) ("Under the discovery rule a cause of action accrues 'when a person discovers, or reasonably should have discovered, the existence of all elements essential to the cause of action.'") (quoting *Cameron v. State*, 822 P.2d 1362, 1366 (Alaska 1991)).

**36.** *See, e.g.,* RESTATEMENT (SECOND) OF CONTRACTS § 16 cmt. c (1981) ("Where a contract is voidable on the ground of intoxication, the rules as to ratification and avoidance are much the same as in cases of misrepresentation. On becoming sober, the intoxicated person must act promptly to disaffirm and must offer to restore consideration received.") (internal reference omitted).

We REVERSE that portion of the court's decision that Erkins released his claims against the appellees by entering into a forbearance agreement because a genuine issue of material fact exists as to whether the inclusion of the waiver of claims provision in the forbearance agreement constituted constructive fraud. We REMAND for further proceedings consistent with this opinion.